**Leonard GROVER, Plaintiff,**

v.

**UNITED STATES of America, Defendant and Third–Party Plaintiff,**

v.

**Alan J. GROVER,
Third–Party Defendant.**

**Civ. A. No. 83–2645–WD.**

United States District Court,
D. Massachusetts.

May 5, 1988.

George S. Chefitz, Chestnut Hill, Mass., for plaintiff Leonard Grover.

Daniel F. Brown, Trial Atty., U.S. Dept. of Justice, Washington, D.C., for U.S.

Alan J. Grover, Malden, Mass., third-party defendant, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOODLOCK, District Judge.

This is a tax refund suit in which the parties seek to ascertain the respective liabilities of Alan J. Grover and Leonard Grover, formerly the principals of Doctors Grover, P.C. and Chelsea Dental Associates, for unpaid employment taxes from the fourth quarter of 1977 and the first and second quarters of 1978.

The action was brought by the plaintiff, Leonard Grover, who seeks a refund of $12,660.46 plus interest which the Internal Revenue Service offset against his 1979 personal tax refund. The refund was withheld due to an alleged willful failure to collect, pay over, and truthfully account for employment taxes due and owing from The Doctors Grover, P.C. and the Chelsea Dental Associates. The United States counterclaims, asserting that there remains due and owing to the United States a total of $381.48 with respect to the employment tax liability. In addition, the United States brings a third-party action against Alan J. Grover, seeking indemnification from the plaintiff's suit as well as a 100% penalty by reason of Alan Grover's failure to collect the employment taxes due and owing.

This matter was presented to me upon an agreed statement of facts, deposition testimony (as to which the parties agreed the court would be free to make credibility judgments), and several exhibits.

Upon the filings of the parties and the agreed record in this case, I make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FINDINGS OF FACT

Leonard Grover and his brother, Alan J. Grover, are dentists.

During the fourth quarter of 1977 and the first two quarters of 1978, they operated Doctors Grover, P.C. (the "professional corporation") in the Roxbury, Dorchester, and Mattapan areas of Boston. Leonard Grover was Treasurer and a 55% shareholder of the professional corporation; Alan Grover was President and a 45% shareholder. The brothers Grover were the only directors.

During 1977, the professional corporation purchased Chelsea Dental Associates, a group dental practice operating in Chelsea, Massachusetts. Alan Grover became President and Leonard Grover became the Treasurer of the subsidiary corporation. Both the professional corporation and the subsidiary used the same employer identification number for tax purposes.

Following the purchase of Chelsea Dental Associates, Alan Grover worked primarily at the Chelsea office while Leonard Grover worked in their Mattapan and Roxbury offices. Alan Grover was primarily responsible for the Chelsea office while Leonard Grover oversaw the entire operation.

Leonard Grover, who spent approximately 50% of his time dealing with administrative matters, was more deeply involved in day-to-day management than Alan, who spent approximately 20% of his time on management activities.

Nevertheless, the brothers discussed problems and operations of the business fairly frequently and both met with their

corporations' clerk and attorney, Stanley Charmoy. Although their respective responsibilities and their time devoted to management activities differed, both brothers were involved in formulating corporate decisions, including decisions about hiring and firing of dentists and other employees, the salaries to be paid to employees, and the fee schedules to be used for non-Medicaid patients. In addition, both signed the original loan documents necessary to obtain financing for the acquisition of the Chelsea Dental Associates practice.

Both brothers periodically made cash advances from their own personal funds and agreed to forego their salaries in order to provide capital to their corporation when the corporation was low on funds. No loan documents were prepared with respect to these cash advances and the professional corporation never repaid them.

The brothers Grover had signature authority over the checking account of Chelsea Dental Associates at State Street Bank and Trust Company. Alan Grover had sole signature authority on the Chelsea Dental Associates' lock box account at Town Bank and Trust Company and Alan Grover had joint authority on the Chelsea Associates' petty cash account at Commonwealth Bank with the Chelsea Office Manager, Mary Robinson. Alan signed all checks written on this account.

In 1977 Doctors Grover, P.C. experienced severe cash problems resulting from slow reimbursements for the Medicaid services which formed a large portion of their practice. Contributing as well to their financial problems were the poor financial organizational and management skills of the doctors.

At approximately the time that the professional corporation purchased Chelsea Dental Associates, the brothers Grover also decided to hire Sanford Schupper and his corporation, Dentiserve, Inc., for the purpose of handling collections from patients, billings to Medicaid, preparation of payroll and others checks to creditors for signature by the Grovers, withholding taxes from wages of employees, and providing tax returns for the entire Doctors Grover, P.C. practice.

The decision of the brothers Grover to hire Schupper was made despite their having received a damning report by the only former client of Schupper's whom they contacted as a reference. The brothers Grover variously recall that this client, Dr. Gary Sloan, told them that Schupper was "a thief and a robber" and that Sloan was suing Schupper "for mishandling his funds and mishandling his duties." Sloan also reported that Schupper had threatened Sloan with a gun. Sloan recommended that the Grovers not do business with Schupper.

The Grovers were concerned about Schupper's trustworthiness and reliability even before hiring him. Had their financial condition been better they might not have done so. Nevertheless, they made the choice to engage his services after Schupper represented to them that he could help them get loans for their dental practice. In hiring Schupper, they determined, as they put it, that their attorney Charmoy, would "watch him like a hawk."

Almost immediately after Schupper was hired by the Grovers, financial matters turned steadily worse. The computer printouts of billing accounts and Medicaid accounts provided by Schupper did not provide an effective oversight for Schupper's activities because the information listed was frequently inaccurate and out of date. Schupper did not pay bills until the last possible moment and sometimes beyond. The Grovers received calls from utility companies threatening to shut off services. The Grovers were forced to direct Schupper to make the payments. They received calls from the mortgage holder in connection with Chelsea Associates when payments were not timely made. And again they had to direct Schupper to make these payments. In addition, laboratories called the Grovers complaining that payments which had previously been made on a timely basis before were now months late. The Grovers called Schupper to find out why laboratory payments had not been made as they had directed and in one case Schupper

told the Grovers that the check was in the mail. After another call from the laboratory indicated that it had not been paid, Schupper told the Grovers that he must have sent it to the wrong address.

Schupper was mistrusted by administrative personnel in the various offices of the Doctors Grover, P.C. and Chelsea Dental Associates. These personnel complained to the Grovers that payment checks received did not appear on Schupper's computer printouts. While the Grovers believed that the complaints of the office managers were based on jealousy because Schupper had taken over certain responsibilities of the office managers, they nevertheless acquiesced in a demand by the Chelsea Office Manager, Mary Robinson, that a separate petty cash account be opened to handle emergencies such as cutoffs because Schupper was not making timely payments. The manager of the Grovers' Roxbury office, in fact, quit her job after complaining to the Grovers for several months that Schupper was dishonest and that she could not work with him.

The relationship between the Grovers and Schupper ended in June 1978 when the Grovers' licenses to practice dentistry were suspended because they had permitted unsupervised services to be performed by an unlicensed Russian dentist in their employ. While neither of the Grover brothers was present at the time that the incident occurred, they were deemed by the Commonwealth of Massachusetts to be responsible for the incident as the owners and operators of the corporation which employed the unlicensed individual.

After the relationship with Schupper ended, the Grovers learned that he had embezzled as much as $25,000 from their corporation. The Grovers sold their practice to another group of dentists in June of 1978. The withholding and Social Security taxes owed by the Doctors Grover, P.C. and Chelsea Dental Associates for the fourth quarter of 1977 and the first two quarters of 1978 were not paid. On January 12, 1981, the United States assessed against both Leonard Grover and Alan individually[1]

$12,476.67 for unpaid trust fund taxes of the Doctors Grover, P.C. and Chelsea Dental Associates for the fourth quarter of 1977 and the first and second quarters of 1978.

On or about September 14, 1981, the United States offset $12,660.46 due Leonard Grover from his 1979 income tax refund against the outstanding trust fund tax assessment and accumulated interest. This offset left an unpaid balance in the amount of $381.48.

In November 1982 Leonard Grover made a timely claim for a refund with respect to the amounts offset. The Internal Revenue Service denied this refund in May of 1983 and on September 8, 1983, Leonard Grover commenced this action.

### CONCLUSIONS OF LAW

The Internal Revenue Code provides a carefully structured system to insure that the United States is not deprived of the income tax and Social Security tax required to be withheld from the wages of employees. Pursuant to 26 U.S.C. § 7501 of the Internal Revenue Code, employers are required to withhold these monies in trust for the United States. Withholding tax liability arises at the time wages are paid and the employer must report the amount on a quarterly basis. The Code also imposes personal liability upon those individuals responsible for determining and remitting withholding tax who willfully fail to insure that such taxes are remitted. 26 U.S.C. § 6672. *See generally Caterino v. United States,* 794 F.2d 1, 3 (1st Cir.1986).

The First Circuit has read broadly the responsibility and willfulness elements of individual liability under § 6672.

#### A. Responsibility

A person is considered to be responsible if he is within the class of

all those connected with a corporation so as to be responsible for the performance of the act in respect of which the violation has occurred. Liability is not limited to those employees performing merely

1. *See* footnote 2 *infra.*

mechanical functions of collection and payment ... but extends to all with responsibility and authority to avoid the default which constitutes a violation of the statute; even though more than one person may be liable.

*Harrington v. United States,* 504 F.2d 1306, 1312 (1st Cir.1974) (citations omitted)

■ Within this broad definition, the requirement of responsibility is met so long as a person maintains significant authority to control the disbursement of the taxpayer's funds.

■ Delegation of the actual preparation of tax returns, the keeping of records, the payment of wages and the withholding of taxes does not reduce an otherwise responsible person to the status of one not responsible. A responsible person may not delegate ultimate accountability, particularly where the delegator retains the power to fire the person to whom he has delegated some responsibility. *See, e.g., Harrington,* 504 F.2d at 1315; *Internal Revenue Service v. Blais,* 612 F.Supp. 700, 707 (D.Mass. 1985).

■ I conclude that throughout the relevant period, Leonard Grover and Alan J. Grover were responsible persons of the Doctors Grover, P.C. and of Chelsea Dental Associates within the meaning of § 6672. They were the principal officers and the only shareholders and directors of those corporations. They managed the day-to-day operations of the two entities and maintained signature authority over the checking accounts in their practice. They were actively involved in decisions to hire and fire as well as to establish general fee schedules. They made the decision to purchase Chelsea Dental Associates and the decision to engage Sanford Schupper to handle certain of their financial affairs. Even after Schupper was retained, they continued to exercise the right to direct which creditors would be paid. They, in fact, chose to exercise this right when certain bills were not paid.

## B. Willfulness

■ The principal dispute in this case has been whether the Grovers were willful in the exercise of their role as responsible persons. The Grovers contend that they were at most negligent in their failure to supervise Schupper. The First Circuit has defined the element of willfulness expansively.

Willfulness in this context is the 'voluntary, conscious, and intentional decision to prefer other creditors to the United States.' Any responsible person who knows the taxes are not paid and allows the business to pay other creditors acts willfully. Evil motive and specific intent are not necessary elements. Mere knowledge, or reckless disregard for known risks is sufficient.

. . . .

Willfulness for purposes of section 6672 means no more than knowledge that taxes are due and withheld in conscious disregard of the obligation to remit them.

*Caterino v. United States,* 794 F.2d at 6.

In a characteristically comprehensive opinion, Judge Keeton identified three fact patterns from which reckless disregard may be inferred sufficient to demonstrate willfulness.

First, courts have held that reliance on the statements of a person in control of the finances of a company may constitute reckless disregard when the circumstances show that the responsible person knew that the person making the statements was unreliable....

Second, courts have held that '[w]illful conduct also includes failure to investigate or to correct mismanagement after having noticed that withholding taxes have not been remitted to the Government.' ...

Third, courts have found that when a responsible person continues to pay other bills knowing that the business is in financial trouble he willfully violates § 6672 if he fails to make reasonable inquiry as to whether money would or would not be available for payment of the taxes when they become due.

*IRS v. Blais,* 612 F.Supp. at 710 (citations omitted).

I conclude that Leonard Grover and Alan Grover acted willfully in these circumstances within the meaning of the first and third recognized fact patterns identified by Judge Keeton. Moreover, a fair reading of the second fact pattern here suggests that it may be extended to provide a further basis for finding willfulness by the Grovers.

Within the pattern of the first classification, the circumstances here could not have been clearer that significant questions had been raised about the reliability of Schupper. The only reference questioned by the Grovers provided a vivid and forceful negative recommendation indicating that Schupper was a thief and a robber, that the reference was suing him for mishandling funds, and that Schupper had in fact threatened the referee with a weapon. The reference put the Grovers on plain notice that the man with whom they were working must be carefully supervised. They acknowledge that they felt when hiring him that it was necessary "to watch him like a hawk." The concerns about Schupper's liability were reinforced by their experience with him. The warnings and subsequent departure of the Roxbury Office Manager, Donna Last, who challenged Schupper's honesty, and the insistence of Mary Robinson, the Office Manager in Chelsea, that a separate petty cash account be opened because she did not consider Schupper reliable to pay important bills, underscores the Grovers' notice of Schupper's unreliability.

Within the pattern of the third classification identified by Judge Keeton, it is apparent that the Doctors Grover, P.C. and Chelsea Dental Associates were businesses in financial trouble. The Grovers received repeated inquiries from utilities, laboratories and even their mortgage holder regarding late payments. These payments were apparently made only after their specific direction by the Grovers to Schupper. Under these circumstances, the Grovers had a duty to make reasonable inquiry whether monies were available for payment of the trust fund taxes when they became due. This duty of reasonable inquiry was underscored here for the Grovers because they had previously been involved in a dispute with the IRS over the payment of trust fund taxes and consequently were aware of the unique responsibilities individuals might have for such payments.

Finally, the second class of cases identified by Judge Keeton also seems applicable. There is no doubt that there was substantial mismanagement of the Grovers' business affairs by their delegate, Schupper. Although I find the Grovers had no actual notice that withholding taxes had not been remitted to the Government, their awareness of Schupper's financial mismanagement was sufficient to charge them with constructive knowledge that the taxes were not being timely paid. Under the circumstances, I am satisfied that the Grovers were willful within the meaning of the second category identified by Judge Keeton.

I conclude that Leonard Grover and Alan J. Grover acted with reckless disregard for their duties as responsible persons to see that the trust fund taxes were properly withheld and timely paid over to the Government.

Judgment shall enter in this case dismissing Leonard Grover's complaint and awarding to the United States a judgment against Leonard Grover on its counterclaim in the amount of $381.48 plus statutory interest in accordance with 26 U.S.C. §§ 6621 and 6622 from September 14, 1981, until the date of the judgment with interest accruing thereafter in accordance with 28 U.S.C. § 1961(c) and 26 U.S.C. §§ 6621 and 6622. Judgment shall also enter in favor of the United States on its second cause of action in its third party action against Alan J. Grover in the amount of $381.48 plus statutory interest in accordance with 26 U.S.C. § 6621 and 6622 from September 14, 1981, until the date of judgment and with interest accruing thereafter in accordance with 28 U.S.C. § 1961(c) and 26 U.S.C. §§ 6621 and 6622.[2]

**2.** The judgment creates liability on the part of    each of the brothers Grover for the outstanding

amount. The judgment is based, however, upon the representation of the Government, *see footnote* 1, to the "Trial Brief for Defendant and Third–Party Plaintiff United States of America" at 3 that:

"It is the United States' policy to only collect once the total amount of trust fund taxes which are not remitted to the government by the nonpaying corporation. *See USLife Title and Insurance Co. of Dallas v. Harbison*, 784 F.2d 1238, 1243 (5th Cir.1986)."
*See also United States v. Sotelo*, 436 U.S. 268, 279 n. 12, 98 S.Ct. 1795, 1802 n. 12, 56 L.Ed.2d 275 (1978).