**Daniel HAMMON, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 264–88 T.**

United States Claims Court.

July 9, 1990.

Sean M. Rhatigan, Oakland, Cal., for plaintiff.

Stuart J. Bassin, Washington, D.C., with whom was Shirley D. Peterson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

The Internal Revenue Service (IRS) assessed a penalty against Mr. Daniel Hammon (plaintiff) for failure to pay the employment taxes of Heatherly & Sons, Inc. (Heatherly) and Pan Alaska Trucking, Inc. (Pan Alaska). Plaintiff paid a portion of the penalty and now seeks a refund of that amount. Defendant has counterclaimed for the unpaid balance of the penalty assessed under Section 6672 of the Internal Revenue Code (IRC), 26 U.S.C. § 6672(a) (1988).

After a trial from April 30 to May 5, 1990, this court determines plaintiff must pay penalties for Heatherly's fourth quarter 1980 and Pan Alaska's first quarter 1982. Plaintiff did not willfully fail to pay taxes for Pan Alaska's fourth quarter 1981.

## FACTS

Plaintiff began selling and leasing automobiles in 1950. In 1959, he purchased his first of several automobile dealerships. Joint Memorandum Re: Stipulations, No. 264–88T, filed April 4, 1990, (Stip.) at ¶ 25; Transcript of Proceedings, No. 264–88T, filed May 29, 1990 (Tr.), at 77–79. Over the next decade, plaintiff acquired several vehicle sales and leasing businesses. *Id.* Due to his experience and ability, plaintiff prospered. His enterprises grew into a network of businesses that encompassed much of the United States. *Id.* Plaintiff also acquired controlling interest in several Alaska corporations, including Sky Hills, Inc., a gravel operation near Anchorage, and L & J Trucking, Inc.

In 1975, plaintiff owned All–Car Leasing Service Company (All–Car). All–Car leased vehicles and equipment in many western states, including Alaska. Through All–Car, plaintiff leased equipment to his other corporations. For instance, All–Car leased trucking equipment to L & J Trucking, Heatherly, and other Alaska operations. All–Car also acted as a holding company for most of plaintiff's other business enterprises. Stip., at ¶ 26. Thus, this entity funnelled financial support to plaintiff's entire corporate empire.

### Heatherly

Plaintiff and L & J Trucking acquired Heatherly from Glenn and Zelda Heatherly in 1975. Heatherly had authority from the Interstate Commerce Commission (ICC) and the State of Alaska to haul equipment and material statewide for construction of the trans-Alaska oil pipeline. L & J Trucking had more limited authority. Thus, the purchase of Heatherly enabled plaintiff to

expand his Alaska trucking operations. Plaintiff personally travelled to Alaska to negotiate with Glenn Heatherly for the purchase. Tr., at 86, 1029.

Plaintiff controlled 100% of Heatherly's outstanding common stock. Stip., at ¶ 43. Plaintiff also served as president of Heatherly. The corporate by-laws of Heatherly defined plaintiff's presidential duties:

> The President shall preside at all director's and stockholder's meetings; shall have general supervision over the affairs of the corporation; shall sign all stock certificates and written contracts of the corporation, and countersign all checks, and shall perform all such certificates, contracts and checks; and shall perform all such other duties as are incident to this office. In case of the absence or disability of the president, his duties shall be performed by the vice-president.

Stip., at ¶ 47; Tr., at 87–88, Exhibit (Ex.) 17, p. 5. In this capacity, plaintiff did preside at Heatherly board meetings. Tr., at 414–15.

Plaintiff resided in California. Therefore, Mr. Frank Thronson, the vice-president, managed the day-to-day operations of Heatherly. Tr., at 88, 90. When in Alaska, however, plaintiff met with other executives in search of more business for Heatherly and generally presided over Heatherly. Tr., at 235, 334–45, 368–69. Plaintiff was in Alaska 10–20 weeks in 1975, 5–12 weeks in 1976–1979, and 5–6 weeks in 1980. Tr., at Ex. 243, p. 4.

Although acting as day-to-day manager, Mr. Thronson needed and acquired plaintiff's approval for important Heatherly operations. Tr., at 91, 100, 366, 369–70. Plaintiff consulted often with Mr. Thronson and gave him considerable latitude to manage the business. Even when initially disagreeing with Mr. Thronson, plaintiff would often acquiesce and approve Mr. Thronson's recommendations. Tr., at 93, 95–96, 100. Nonetheless plaintiff occasionally overruled Mr. Thronson summarily. Tr., at 241–42. Mr. Thronson, while occasionally balking, ultimately would implement plaintiff's direct orders. *See, e.g.,*

Tr., at 354. Plaintiff remained in control of Heatherly's operations. Tr., at 186, 607, 610.

At first, Heatherly's operations yielded respectable profits. Consequently, in the first one and one-half years, plaintiff travelled to Alaska often to perform his presidential duties. Tr., at 90. By 1977, however, the approaching completion of the pipeline caused a decline in the Alaska economy. Heatherly's fortunes reversed. Heatherly ceased operations with the onset of winter in 1978.

During these initial years of plaintiff's ownership, Heatherly encountered employment tax difficulties. The IRS assessed Heatherly for employment tax deficiencies for the third and fourth quarters of 1976 and the first and third quarters of 1977. Tr., at Ex. 209. To retire these delinquencies, plaintiff directed All–Car to lend Heatherly over $80,000.00. Heatherly used this loan to pay the back taxes. Stip., at ¶¶ 69–71.

In 1980, two years after ceasing operations, Heatherly began operations anew. Two new contracts gave Heatherly renewed purpose. Heatherly began hauling gravel for Norcon, Inc., Tr., at Ex. 25, and hot oil for road paving. Stip., at ¶ 58. The gravel job lasted about four months, until Norcon went bankrupt. Tr., at 105–06.

During this second period of operations, Heatherly funds were commingled with Alaska All Car funds. Tr., at 127–28, Ex. 109. Alaska All Car was the Alaskan subsidiary of All–Car. *See, e.g.,* Tr., at 358. Plaintiff channelled much of Heatherly's receipts and disbursements through Alaska All Car. Plaintiff was aware of Alaska All Car's expenditures. In fact, plaintiff personally signed Alaska All Car checks. Tr., at 254–55.

Plaintiff also consulted with Mr. Thronson about payments to All–Car. Tr., at 346. By checking on payments to All–Car and agreeing to loans, plaintiff monitored Heatherly's financial operations. Mr. Thronson repeatedly acknowledged plaintiff's control over Heatherly's financial affairs. Tr., at 352, 358, 363, 368. Through Alaska All Car and All–Car, plaintiff exert-

ed control of Heatherly's disbursements and financial obligations. Tr., at 346; *see* note 7, *infra.*

As mentioned earlier, the Norcon job did not last long. Norcon soon applied for bankruptcy. At that time, Norcon had not paid Heatherly for much of its work. Tr., at 114–17. Without payment from Norcon, Heatherly, too, faced financial difficulty. Tr., at 105–06. At the time it ceased operations in 1980, for example, Heatherly owed the Teamster's Union over $100,000.00 in employee pension contributions. Tr., at 117. Nonetheless, after personally meeting with Norcon's president, Tr., at 605–06, plaintiff decided not to pursue further claims against Norcon. Tr., at 581. In November 1980, Heatherly ceased operations.[1]

In the third quarter of 1980, Heatherly again did not pay its federal employment taxes. Alaska All Car, the Alaskan subsidiary of All-Car, paid a part of this obligation in September 1980. The IRS recovered another portion of this delinquency by levying against Heatherly's accounts receivable from Norcon. Stip., at ¶¶ 71–72. Finally, in September 1981, the IRS received full payment for the third quarter of 1980.

1. Heatherly ceased operations for several reasons. The Norcon and hot oil contracts were complete. Thus, Heatherly had no work at the onset of Alaska's winter. In addition, Alaska state transportation officials determined that Heatherly lacked authority to haul hot oil and other items. Transcript of Proceedings, No. 264–88T, filed May 29, 1990 (Tr.), at 112–113.

2. Mr. Bob G. Langberg corroborated that Ms. Brady met with plaintiff, but could not recall the exact date of the meeting. Tr., at 568, 613–16. Ms. Brady's written report of that interview, however, supplied the date of February 18, 1981. Tr., at Ex. 206. On the same date, Ms. Brady prepared a Collection Information Statement (CIS). Tr., at Ex. 207. Plaintiff signed Ms. Brady's statement in a different color ink, thus showing his presence at the interview. *Id.;* Tr., at 224–25. Ms. Brady is now deceased. Mr. Darrel Nather, Ms. Brady's supervisor at Internal Revenue Service (IRS), supplied very credible testimony that Ms. Brady normally would complete these two forms—the interview report and the CIS—in the same meeting. Tr., at 858–59. Mr. Nather offered other

Heatherly, however, also did not pay its federal employment taxes for the fourth quarter of 1980. This fourth quarter assessment is the subject of this lawsuit. Heatherly paid its last wages to employees in October and November of 1980. Heatherly withheld federal employment taxes from these wages, but did not pay the withheld amounts to the Treasury.

In his pretrial submissions and early in the trial proceedings, plaintiff did not recall learning of this delinquency until early in 1984. Plaintiff's Memorandum of Contentions of Fact and Law, filed April 3, 1990 (Pl.Mem.), at 11; Tr., at 214. The record shows, however, that plaintiff knew of the delinquency as early as October or November of 1980—the time when Heatherly paid the wages.

IRS officer Dorothea Brady interviewed plaintiff in person on February 18, 1981 about Heatherly's pending tax delinquency for the fourth quarter of 1980.[2] Ms. Brady prepared a written transcript of that interview. Tr., at Ex. 206.[3] During that interview, Ms. Brady asked plaintiff, "When did you first become aware that the tax liability was not paid?" Ms. Brady recorded plaintiff's answer: "October or November of 1980." Tr., at 854, Ex. 206. Thus, on February 18, 1981, plaintiff professed to

evidence that plaintiff appeared in person for the interview with Ms. Brady in February 1981. Tr., at 860. Mr. Nather testified convincingly that the record suggests that Ms. Brady interviewed plaintiff specifically about Heatherly's delinquency for the fourth quarter of 1980.

3. Ms. Brady knew about Heatherly's 1980 fourth quarter delinquency before the interview. Mr. Nather noted that Ms. Brady attempted on February 2 and 5, 1981 to collect Heatherly's taxes for the fourth quarter of 1980 from Heatherly's clients. Tr., at 835–38, Ex. 30. Thus, Ms. Brady knew of Heatherly's delinquencies two weeks before her interview with plaintiff about Heatherly's outstanding tax deficiencies.

Moreover, on September 3, 1980, Mr. Langberg sent IRS a letter indicating that Heatherly was current on all past payroll taxes. Tr., at 959–60, Ex. 208. Thus, when Ms. Brady met with plaintiff on February 18, 1981, they must have discussed Heatherly's only remaining delinquency, the fourth quarter of 1980. According to the September 3, 1980 letter, Heatherly had retired all other delinquencies months before the February meeting.

have learned of the delinquency three or four months earlier.[4]

Mr. B.J. O'Connor, Heatherly's bookkeeper and accountant, corroborated Ms. Brady's record of plaintiff's admission. In a February 2, 1981 interview with Ms. Brady, Mr. O'Connor stated that he told plaintiff of the delinquency sometime around December 1, 1980. Tr., at Ex. 205. In his court testimony, Mr. O'Connor supplied more detail. He reiterated that he personally told plaintiff of the unpaid fourth quarter taxes in the middle of October. Tr., at 962, 967–68. In response, plaintiff advised Mr. O'Connor to pay the taxes with money owed to Heatherly by Norcon. *Id.* At trial, plaintiff recalled suggesting that the IRS could collect the taxes from Norcon. Tr., at 134–35, 216, 1230–31.[5] Mr. O'Connor also testified that plaintiff might have paid Heatherly's taxes from the Alaska All Car account. Tr., at 970.

Indeed, the trial evidence refreshed plaintiff's recollection. Near the close of trial, he testified that he knew in November 1980 of Heatherly tax difficulties. Tr., at 1234. Plaintiff agreed that he must have known of the problem at the time of his February 1981 meeting with Ms. Brady. Tr., at 1253.[6] Thus, the evidence clearly shows that plaintiff knew of Heatherly's failure to pay employment taxes for the fourth quarter of 1980 as early as October 1980.

On April 9, 1984, IRS assessed a $74,169.80 penalty against plaintiff for failure to pay Heatherly's payroll taxes for the fourth quarter of 1980. With interest and statutory additions of $19,038.30, IRS assessed against plaintiff a total of $93,208.10 for Heatherly. Stip., at ¶¶ 5–6. IRS already has received $26,311.00 for Heatherly's 1980 taxes. Stip., at ¶¶ 8–9. Therefore, IRS seeks payment of another $49,269.80 plus accrued interest. Tr., at 1263. Plaintiff has filed a timely claim for refund. Stip., at ¶ 21. Defendant has filed a counterclaim for the unpaid balance.

The parties still dispute the significance of some tax payments by Heatherly. On August 19, 1980, Heatherly issued checks to the IRS. Tr., at Ex. 103. One of these checks, for instance, was payable to IRS in the amount of $33,428.49. Tr., at 506–14, Ex. 103. The detachable bottom half of this check contained the following handwritten notations: "Const—P/R/1–3." Ms. Peggy Thronson testified that these markings meant "construction payroll" for three payroll periods. *Id.; see also*, Tr., at 551. Mr. Nather testified very credibly, however, that IRS had no way to decipher the meaning of those markings or to determine how to credit the payments. Tr., at 818–19. Ms. Thronson agreed that a reviewing IRS agent would have to guess the meaning of "1–3" on the check. Tr., at 551; *see also*, Tr., at 611.

When Ms. Brady, the IRS revenue officer, received these payments, she used the proceeds to retire some of Heatherly's and Sky Hill's past tax delinquencies. Tr., at Ex. 209, 210. She wrote a letter to plaintiff explaining that she had allocated the payments to satisfy these older delinquencies. *Id.* This action followed IRS policy. Tr., at 816–19. In that September 24, 1980 letter, Ms. Brady also apprised plaintiff of an outstanding tax delinquency for Heatherly's "September quarter." *Id.* Plaintiff

---

4. Other evidence also shows that plaintiff knew of the 1980 fourth quarter deficiency near the time Heatherly did not pay the taxes. When IRS recommended assessment of a penalty against plaintiff, the document noted that plaintiff had earlier signed a waiver concerning the fourth quarter of 1980. Tr., at 820–21, Ex. 204. This waiver would provide plaintiff with notice of the delinquency. Tr., at 822. Further, numerous witnesses praised plaintiff's grasp of financial dealings. The circumstances of Heatherly's closing down and its history of prior tax difficulties strongly suggests that plaintiff made some effort to learn of the company's tax status in late 1980 and early 1981.

5. In his initial testimony, plaintiff recalled telling Mr. Thronson to pay taxes with Heatherly proceeds due from Norcon. After hearing the testimony of other witnesses, plaintiff concluded that he must have given those instructions to Mr. O'Connor.

6. At the outset of trial, plaintiff could not recall meeting with Ms. Brady in February of 1981. Tr., at 223–24. After hearing the evidence, plaintiff agreed that the meeting must have taken place. Tr., at 1253.

did not notify the IRS of any disagreement with Ms. Brady's allocation of the August 19 payments to the Heatherly and Sky Hill delinquencies.

*Pan Alaska*

In the summer of 1980, plaintiff and other persons associated with Heatherly learned of an opportunity to expand trucking operations in Alaska. Tr., at 136. Specifically, Sea–Land, Inc. (Sea–Land), a major Alaska shipper, decided to hire another firm to handle its extensive trucking business. As president of Heatherly, plaintiff entered into negotiations with Sea–Land to acquire this contract. Stip., at ¶ 81; Tr., at 140, 270, 583, 593, 653, 920, 1067–68.

These negotiations encountered some difficulty. The Teamsters Union would not agree to a change in operations which did not protect their Sea–Land workers. Tr., at 185–99. If Heatherly assumed Sea–Land's work, Heatherly's drivers would have seniority over the former Sea–Land workers. Therefore, plaintiff met with Teamsters Union representatives to arrange protections for Sea–Land's workers. Tr., at 138, 146, 199–203, 276, 297–98, 632–33. To make the seniority of Heatherly's drivers less of a threat to Sea–Land workers, plaintiff established Pan Alaska. Tr., at 138–40. Pan Alaska, as a new corporation, could honor the contracts of Sea–Land's union truckers.

On October 29, 1980, plaintiff, Mr. Thronson, and Ms. Peggy Thronson—Frank Thronson's niece—incorporated Pan Alaska. Stip., at ¶ 73. Plaintiff owned all of Pan Alaska's outstanding common stock. Stip, at ¶ 74. At the outset, Mr. and Ms. Thronson were directors of Pan Alaska. On January 13, 1981, Mr. Conner Thomas and Mr. Bob Langberg replaced the Thronsons as directors. Stip., at ¶ 75. Plaintiff served as Pan Alaska's president.

Pan Alaska's bylaws set forth plaintiff's duties as president:

> The president shall be the principal executive officer of the corporation and, subject to the control of the directors, shall in general supervise and control all of the business affairs of the corporation. He shall, when present, preside at all meetings of the stockholders and of the directors. He may sign, with the secretary or any other proper officer of the corporation thereunto authorized by the directors, certificates … and in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the directors from time to time.

Stip., at ¶ 78. Plaintiff also served as a director of Pan Alaska. Stip., at ¶ 75. Plaintiff helped negotiate or directly approved all of Pan Alaska's major written or oral contracts with the Teamsters, Sea–Land, and the corporation's owner-operators. *See, e.g.,* Tr., at 897–98; Stip., at ¶ 91.

On November 13, 1980, Sea–Land and Pan Alaska agreed that Pan Alaska would haul much of Sea–Land's freight. Stip, at ¶ 83; Tr., at Ex. Q–1. Pan Alaska undertook those duties on January 1, 1981. Plaintiff hired Mr. Conner Thomas to manage the day-to-day activities of Pan Alaska. Tr., at 649–50. Mr. Thomas reported regularly to plaintiff. Tr., at 157, 289, 658–63. Plaintiff remained ultimately in charge of Pan Alaska. Tr., at 897–98, 907–08, 931–34.

Almost immediately, disputes over rates arose between Pan Alaska and Sea–Land. Plaintiff participated in negotiations to resolve these disagreements. Tr., at 145, 632, 663–64, 921–22, 924–25, 1081. In fact, plaintiff made the final decisions and handled many weighty issues in the negotiations. Tr., at 157, 197–99, 924–25, 1080, 1082–83.

Plaintiff participated in financial as well as labor negotiations for Pan Alaska. He obtained a line of credit for Pan Alaska from the First Bank of Ketchikan (First Bank). Stip., at ¶ 85; Tr., at 146–47. The Bank secured the credit with an interest in the assets of Pan Alaska, including the accounts receivable from Sea–Land. Stip., at ¶ 86; Tr., at Ex. 34–40. Plaintiff also personally guaranteed First Bank's line of credit. *Id.;* Tr., at 1038. This line of credit was Pan Alaska's primary source of working capital throughout its 14 months of operation.

Plaintiff also participated in the management of Pan Alaska. For instance, plaintiff contributed to the decision to move some of Pan Alaska's administrative personnel from Pan Alaska's facility into Alaska All Car's facilities several miles away. Tr., at 149–51, 666–67. This move reduced Mr. Conner Thomas's access to and oversight of the corporation's financial affairs. Tr., at 151, 652, 667. Moreover, plaintiff ordered the dismissal of Mr. Gerald Schreiner. Tr., at 1070. Plaintiff also applied to the ICC to acquire enhanced hauling authority for Pan Alaska. Stip., at ¶ 92; Tr., at Ex. 49–50, p. 300.

As part of his participation in Pan Alaska's management, plaintiff received monthly financial statements on the corporation. Tr., at 158, 640–41. These statements kept plaintiff in touch with the profitability of Pan Alaska. Mr. Ray Rainwater, Pan Alaska's controller, prepared these reports until his illness in January 1982. Tr., at 1129–30. Plaintiff consulted these reports and discussed them regularly with Mr. Rainwater. Tr., at 1131. Plaintiff occasionally directed Pan Alaska personnel to make payments on particular accounts. Tr., at 1146–47, 1150.

Plaintiff also settled disputes amongst his subordinates in Pan Alaska's management team. Tr., at 157–58. On one occasion, for instance, Mr. Bob Langberg called for the removal of Mr. Conner Thomas. Although not present in Alaska at the time, plaintiff resolved the conflict by telephone. Tr., at 291, 659. Mr. Thomas retained his position.

Pan Alaska encountered financial difficulties late in 1981 and early in 1982. Mr. Langberg and Mr. Thomas resigned as officers and directors of Pan Alaska effective October 31, 1981 and November 23, 1981 respectively. Tr., at 286–87, Ex. 252.

Thus, plaintiff was the only officer of Pan Alaska from November 23, 1981 until February 11, 1982 when Mr. Thronson accepted appointment as Secretary/Treasurer. *Id.*

Plaintiff learned in January that First Bank planned to close its Anchorage operations. Tr., at 162–63. First Bank demanded repayment of all outstanding credit by February 20, 1982. Tr., at 884. Over the next several weeks, plaintiff tried unsuccessfully to get financing elsewhere. Tr., at 163, 304–05.

In February 1982, in the midst of these difficulties, plaintiff placed Mr. Thronson in charge of Pan Alaska. *See, e.g.,* Tr., at 392. On February 26, when some Pan Alaska drivers expressed concern over getting paid, Mr. Thronson personally guaranteed payment of their wages until March 2, 1982. Tr., 394, at Ex. 116. On March 1, Mr. Thronson authorized First Bank to honor payroll checks signed earlier by Mr. Thomas. Tr., at Ex. 115.

Near the end of Pan Alaska's operations, plaintiff continued to participate in decisions about payment priorities. For instance, plaintiff inquired of subordinates about payment of Northwest Acceptance Corporation, union benefits, and payroll taxes. Tr., at 768–69. Plaintiff personally had guaranteed a loan in the amount of $400,000.00 from Northwest Acceptance Corporation to purchase equipment from Sea–Land. Stip., at ¶ 89; Tr., at Ex. 45.

On February 5, 1982, Ms. Patsy Parker, a bookkeeper, prepared a payroll tax check in the amount of $33,429.00 for Pan Alaska. Tr., at Ex. 44. Due to Mr. Rainwater's unexpected illness, Ms. Parker was in charge of Pan Alaska's finances. Tr., at 740–42, 745. Although Ms. Parker prepared the check, she did not deposit it.[7] Stip., at ¶ 88.

---

7. Ms. Patsy Parker testified that she presented the check to First Bank which refused to honor it due to lack of funds. Ms. Parker described this incident as an embarrassing spectacle in front of a lobby of onlookers. Tr., at 746–49. Although not sure who at the bank rejected the check, Ms. Parker thought it was Mr. Frech. Tr., at 747. Mr. William Frech, however, testified that he never would have discussed business in the lobby of a bank. Mr. Frech could not substantiate Ms. Parker's account in the slightest. Tr., at 1044–46, 1049. In fact, Mr. Frech showed that Pan Alaska's account had sufficient funds to cover the $33,429.00 check. Tr., at 1047–48. Plaintiff has not shown that Ms. Parker actually presented this check for deposit. Although First Bank honored many checks after February 5 in amounts greater than

On Friday, March 5, 1982, Pan Alaska normally would have paid its employees. First Bank, however, would extend no further capital to Pan Alaska. Pan Alaska could not meet payroll. Tr., at 730–31. Mr. Thronson engaged in discussions with Sea–Land and the Teamsters Union to save the company. When these discussions collapsed, Mr. Thronson closed Pan Alaska's operations. Tr., at 166–67.

Plaintiff immediately travelled to Alaska. Ms. Parker informed him at that time that Pan Alaska had not paid its payroll taxes. Tr., at 167–68, 753. On March 10, 1982, plaintiff met with First Bank officials. He requested them "to forward any surplus payments made on the line of credit on to the Internal Revenue Service...." Tr., at Ex. 41; see also, Tr., at 887. First Bank, however, never received any surplus beyond its line of credit. Stip., at ¶ 87; Tr., at 890–91. In fact, First Bank sought repayment of its Heatherly loans from Sea–Land. Ultimately, after First Bank instituted a lawsuit against Pan Alaska and plaintiff, the loan was repaid. Tr., at 889–90. Other Pan Alaska creditors, such as the Teamster's Union, did not receive payment through First Bank. Id.

After failing to find alternative financing for Pan Alaska, plaintiff decided to liquidate the company. Tr., at 171–72. Plaintiff contacted Miller & Miller, an auction company, and entered a contract to sell Pan Alaska's equipment. Tr., at 172, 306–07. Once again, plaintiff placed Mr. Thronson in charge of liquidating the corporation. Tr., at 174.

Before the auction, IRS delivered a Notice of Levy seeking satisfaction of the tax delinquencies out of the proceeds of the auction sales. Tr., at 1000–01, Ex. W–19. The Miller & Miller auctioneer told plaintiff of this Notice. Tr., at 1007. Plaintiff did not instruct Miller & Miller to pay any proceeds to IRS. Tr., at 1007, 1010. Pan Alaska, however, received no proceeds from the auction which could have been paid to IRS. Tr., at 1011.

After Pan Alaska had closed its doors and after plaintiff had learned of the corporation's tax delinquencies, the Pan Alaska account received $146,172.78. Tr., at 1265. These funds came into Pan Alaska's checking account between March 5, 1982 and July 1983. Stip., at ¶ 110. Pan Alaska's account disbursed these funds to Alaska All Car.[8] Id.

Throughout this period, plaintiff continued to receive financial reports on Pan Alaska. Tr., at 175, 723–24. In fact, Mr. Kenneth A. Neumann worked for plaintiff at Alaska All Car. Tr., at 717. Alaska All Car employed Mr. Neumann to seek payment from Pan Alaska's remaining debtors. Tr., at 716–17, 722. In this capacity, Mr. Neumann discussed Pan Alaska's finances periodically with plaintiff. Tr., at 718–20, 723–24. Plaintiff took an active interest in recovering funds payable to his enterprises. Tr., at 600.

Attempting to receive all payments due to Pan Alaska, plaintiff wrote numerous letters to Sea–Land during late 1982 and 1983. Tr., at Ex. S–22, S–25, S–27. These letters demonstrate a detailed knowledge of Pan Alaska's accounts. In fact, two letters complain in part that Sea–Land short-changed Pan Alaska by $3.09. Tr., at

$33,429.00, Pan Alaska did not resubmit this check. Stip., at ¶ 88; Tr., at 760–61.

8. "Alaska All Car Leasing Service Company (Alaska All Car) was owned by plaintiff. It was not separately incorporated. Although organizationally related to All–Car, its activities were distinct from those of All–Car. Alaska All Car maintained separate checking accounts of its own at the First National Bank of Anchorage. It maintained a different taxpayer employer identification number than All–Car." Stip., at ¶ 37. Despite protestations to the contrary, Tr., at 124, plaintiff was aware of Alaska All Car's activities as part of All–Car and substantially controlled those business affairs. Tr., at 253–

55, 1112. Alaska All Car, as part of All–Car itself, funnelled assets to and received assets from plaintiff's other corporate entities. Tr., at 127, 522–33, 544–46, 575, 727, 1193, 1200, 1239, Ex. 109. Some Alaska All Car employees actually worked for Heatherly and Pan Alaska. Tr., at 944. Moreover, Alaska All Car provided other services for Pan Alaska. Tr., at 284–85. Ultimately Alaska All Car was the vehicle for liquidation of Pan Alaska's assets. Tr., at 306. None of this commingling of funds or cross-fertilization of personnel presented problems at the time. All of the entities were part of the same corporate empire controlled by plaintiff.

1091–92, Ex. S–25, S–27. Plaintiff also participated actively in negotiations to recover funds payable to Pan Alaska from Sea-Land. Tr., at 1087–88, 1090, 1093. In sum, plaintiff was very familiar with Pan Alaska's finances and reasonably could have been expected to know that $146,172.78—a sizeable sum for Pan Alaska—came into his corporation's bank account. Tr., at 1093, 1097.

In September 1983, IRS assessed a penalty against plaintiff for failure to pay fully Pan Alaska's taxes in the fourth quarter of 1981. Plaintiff did not learn of Pan Alaska's delinquency for this quarter until much later in 1985. Tr., at 177.

On April 5, 1982, IRS assessed a $71,-808.03 penalty against plaintiff for failure to pay Pan Alaska's payroll taxes in the first quarter of 1982. Stip., at ¶ 17; Tr., at 1264. On September 26, 1983, IRS assessed a $26,887.39 penalty against plaintiff for failure to pay Pan Alaska's employment taxes in the fourth quarter of 1981. Stip., at ¶ 16. Against these amounts, plaintiff has paid $100.00. Stip., at ¶ 19. Therefore, IRS seeks payment of $98,-596.42 plus accrued interest. Tr., at 1264. Plaintiff has filed a timely claim for refund of the $100.00. Stip., at ¶ 21. Defendant has filed a counterclaim for the unpaid balance.

## DISCUSSION

An employer deducts and holds employment taxes in trust for the benefit of the United States. 26 U.S.C. § 7501. Any person responsible for breaching that trust is subject to § 6672's tax penalty. Specifically, § 6672(a) of the IRC imposes a tax penalty, "equal to the total amount of the tax evaded," on:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof....

26 U.S.C. § 6672(a). Section 6671(b) defines further the terms of § 6672:

> The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

26 U.S.C. § 6671(b).

The Supreme Court has noted that accumulated federal employment taxes "can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978) (footnote omitted). If an employer elects to convert employment taxes to pay other expenses, the United States becomes, in effect, the tax violator's unwilling business partner. *Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir.), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). Congress enacted § 6672 to deter employers from subordinating their federal employment tax obligations to the interests of other creditors. *Bolding v. United States*, 565 F.2d 663, 669, 215 Ct.Cl. 148 (1977).

The Claims Court's predecessor, the United States Court of Claims, further explained the reason for the harsh 100% tax penalty:

> [E]mployees are entitled to credit for the amounts of FICA and income taxes withheld from their wages regardless of whether or not the employer turns the funds over to the Government. Since, therefore, the Government may actually be out-of-pocket by way of credit or refund for taxes it has never received, Congress has allowed the IRS more stringent protective devices to insure collection of payroll taxes than in the case of many other taxes.

*Bolding*, 565 F.2d at 669 (citations omitted).

The United States Court of Appeals for the Federal Circuit has clarified that § 6672 imposes liability only if a taxpayer is found accountable under both of two statutory tests:

> First, he must be under a duty to "perform the act in respect of which the violation occurs," and that duty is "to

collect, truthfully account for, and pay over" any taxes. Such a person is a "responsible person." Second, the "responsible person" must have "willfully" failed to collect, truthfully account for, and pay over ... the tax....

*Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984) (citations and footnote omitted). This court must first determine if plaintiff was a responsible person within the meaning of § 6672. Because two of plaintiff's corporate entities, Heatherly and Pan Alaska, did not pay federal employment taxes, this court must ascertain whether plaintiff was a responsible person within both corporations.

### Responsible Person Test

■ The Federal Circuit's *Godfrey* decision sets forth in detail several factors for determining whether an individual is "actually responsible for an employer's failure to withhold and pay over the tax." *Godfrey*, 748 F.2d at 1574, quoting *Pacific Ins. Co. v. United States*, 422 F.2d 26, 31 (9th Cir.1970). These factors fall into three interrelated categories: status, duty, and authority. *See, e.g., Howard v. United States*, 711 F.2d 729, 734 (5th Cir.1983). Any person with sufficient status, duty, and authority "to avoid the default" is a responsible person under § 6672. *Godfrey*, 748 F.2d at 1575; *White v. United States*, 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967). Responsibility may rest with more than one employee or officer of a corporation that fails to withhold and pay employment taxes. *Godfrey*, 748 F.2d at 1574–75; *Scott v. United States*, 173 Ct.Cl. 650, 657, 354 F.2d 292, 296 (1965).

■ The determination of responsibility is a matter of substance, not merely form. *Godfrey*, 748 F.2d at 1576. This court must weigh carefully the facts to determine if plaintiff had enough status, duties, and authority to constitute "the power to control the decision-making process by which the employer corporation allocates funds...." *Godfrey*, 748 F.2d at 1575 (quoting *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir.1975)). In other words, this court must ascertain if plaintiff is "a

person with ultimate authority over expenditure of funds." *Godfrey*, 748 F.2d at 1575 (quoting *White*, 372 F.2d at 517). Such an individual "can fairly be said to be responsible for the corporation's failure to pay over its taxes." *Godfrey*, 748 F.2d at 1575 (quoting *White*, 372 F.2d at 517).

### Status

■ The Federal Circuit has stated that holding the position of a corporate officer is not itself a sign of sufficient status to trigger liability:

[The trial court held that plaintiff's] *status* as chairman cum advisor-negotiator—and the respect and deference accorded that status—amounted to "ultimate authority" or "power to control" for purposes of § 6672. The case law will not support that holding.

It is material, but not controlling....

*Godfrey*, 748 F.2d at 1575 (emphasis in original).

With respect to Heatherly, plaintiff was president, majority stockholder, and director. In this capacity, plaintiff presided at board meetings, met with other corporate presidents, and extensively managed the corporation. For instance, as president of Heatherly, plaintiff met with Sea–Land executives to obtain that company's trucking business and with Norcon executives to settle payment disputes. When in Alaska, plaintiff directly supervised Heatherly. When not in Alaska, plaintiff remained in control of Heatherly's operations by consulting with Mr. Thronson.

With respect to Pan Alaska, plaintiff also was president, majority stockholder, and director. In that capacity, plaintiff negotiated, renegotiated, and signed contracts. Just as Mr. Thronson managed Heatherly, Mr. Thomas managed the day-to-day operations of Pan Alaska. Plaintiff, however, retained and exercised ultimate control over corporate affairs. Specifically, as Pan Alaska's president, plaintiff transferred the location of the administrative staff, settled disputes amongst subordinate corporate officers, applied to the ICC for enhanced hauling authority, and otherwise managed the significant affairs of the corporation.

Plaintiff made the company's major decisions.

Plaintiff possessed sufficient status in both Heatherly and Pan Alaska to satisfy this aspect of the responsible person test. As president and majority stockholder of each corporation, no one within either corporation exceeded plaintiff's status or powers. Rather, every other corporate officer or employee took orders, more or less directly, from plaintiff. Particularly in the context of financial affairs, plaintiff controlled both corporations.

*Duties*

The Federal Circuit clarified this aspect of the responsible person test in *Godfrey:*

> [A] person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, nor form.

*Godfrey,* 748 F.2d at 1576.

Heatherly's corporate bylaws and resolutions defined plaintiff's duties. The resolutions empowered plaintiff, in his capacity as president, to "preside at all director's and stockholder's meetings," to supervise "the affairs of the corporation," to "perform all ... contracts and checks," and to "perform all such other duties as are incident to this office." Tr. at Ex. 17, p. 5. The record shows that plaintiff presided, supervised, and performed as required by the corporate bylaws.

Plaintiff also enjoyed ultimate and independent power to disburse funds. Plaintiff monitored closely Heatherly's financial health. Plaintiff discussed Heatherly's finances and tax status directly with Mr. Bob Langberg and Mr. B.J. O'Connor, two of Heatherly's officers. For instance, plaintiff directed Mr. O'Connor to instruct the IRS to seek payment of tax liabilities from funds Norcon owed to Heatherly. In company with Mr. Langberg, plaintiff attended an interview with Ms. Brady, the IRS collection officer.

Plaintiff controlled over Heatherly's finances via All–Car and Alaska All Car. Heatherly funded its operations with loans from All–Car. Plaintiff approved these loans. The accounts of Alaska All Car and Heatherly were commingled. Through his control over All–Car and Alaska All Car, plaintiff dictated the financial affairs of Heatherly.

Pan Alaska's corporate bylaws made plaintiff "the principal executive officer of the corporation." Tr., at Ex. 33, p. 8. Specifically the bylaws empowered plaintiff to "supervise and control all of the business and affairs of the corporation." *Id.* Plaintiff did, in fact, supervise and control Pan Alaska's business affairs.

Plaintiff's duties included supervision and control of Pan Alaska's expenditures. Plaintiff actively performed this aspect of his duties. As with Heatherly, plaintiff closely monitored the financial health of Pan Alaska. Mr. Ray Rainwater and Mr. Ken Neumann supplied plaintiff with regular reports on the corporation's finances. Plaintiff routinely discussed these reports with Mr. Rainwater.

Plaintiff also participated in decisions about which creditors to pay. For instance, near the end of Pan Alaska's operations, plaintiff inquired about payments on a loan from Northwest Acceptance Corporation. Plaintiff personally guaranteed many of the corporation's liabilities, including this $400,000.00 loan from Northwest Acceptance Corporation. As chief officer of Pan Alaska, plaintiff diligently sought repayment of this obligation. Occasionally, plaintiff exercised his extensive authority over financial affairs by directing payments to other accounts.

As in the case of Heatherly, plaintiff further managed Pan Alaska's financial affairs through control of All–Car and Alaska All Car. Plaintiff tightly controlled All–Car and its extensive interrelationship with Pan Alaska. Plaintiff enjoyed ultimate and independent power to disburse Pan Alaska funds.

In sum, plaintiff's duties in both Heatherly and Pan Alaska made him responsible for control of finances. Thus, plaintiff's duties satisfied this aspect of the test for responsibility under § 6672.

*Authority*

The Federal Circuit also has clarified the authority element of the responsibility test:

> [W]here a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held "responsible."

*Godfrey,* 748 F.2d at 1576 (citations omitted). As with other aspects of the responsible person test, this inquiry must focus on substance, not form. The inquiry must focus on actual authority to control, not on titles or trivial duties.

As suggested by the Federal Circuit, a combination of indicators usually accompanies the actual authority sufficient to confer § 6672 responsibility. Among others, these indicators could include the power to vote significant blocks of stock, sign checks, supervise employees, make corporate decisions, enter contracts, sway the corporate board, or prepare corporate tax strategies. All of these aspects of authority need not be present to establish § 6672 liability; some combination generally will show actual and sufficient authority for the tax penalty.

In this case, plaintiff possessed each of the above powers for both Heatherly and Pan Alaska. For instance, plaintiff controlled 100% of the outstanding common stock of Heatherly. Plaintiff owned 100% of the outstanding common stock of Pan Alaska. Although exercised only once in the case of Pan Alaska, plaintiff possessed the power to sign checks for both corporations. Plaintiff extensively supervised both corporations. Plaintiff entered contracts for both corporations. Plaintiff played a particularly pivotal role in the financial affairs of both corporations.

In both substance and form, plaintiff had sufficient authority to show responsibility under § 6672. Stated otherwise, plaintiff had sufficient authority to avoid the defaults. This conclusion applies to both Heatherly and Pan Alaska.

Plaintiff contends that he was not responsible because others managed Heatherly and Pan Alaska on a day-to-day basis. This contention does not absolve plaintiff of responsibility. The United States Court of Appeals for the Sixth Circuit rejected this argument:

> While it may be that ... [others] were *more* responsible than plaintiff, and exercised *greater* authority, this does not affect a finding of liability against plaintiff. Section 6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or the closest control or authority over corporate affairs.

*Gephart v. United States,* 818 F.2d 469, 476 (6th Cir.1987) (emphasis added). As long as plaintiff's personal involvement in the corporations show responsibility, the relative involvement of others is not relevant.

In any event, plaintiff was primarily responsible for the financial management of both corporations in this case. The test for responsibility does not require a showing that plaintiff personally and continually exercised each of his vested corporate powers. The Federal Circuit has cast the responsibility test in terms of "the power to control the decision-making process by which the employer corporation allocates funds" or "the power to compel or prohibit the allocation of corporate funds." *Godfrey,* 748 F.2d at 1575, 1576. Plaintiff had those powers and extensively exercised them.

Plaintiff also argues that he delegated responsibility for payment of taxes to other corporate managers. Some courts have not recognized delegation as a way to avoid § 6672 liability. *See, e.g., Schultz v. United States,* 19 Cl.Ct. 280, 285, n. 6 (1990); *Grover v. United States,* 691 F.Supp. 1572, 1576 (Mass.1988). Most notably, the Claims Court has narrowed application of the delegation exception:

> A delegation is only effective if it is comprehensive as to power and authority over corporate affairs and the ultimate control over corporate management is placed completely in another officer.

*Dougherty v. United States,* 18 Cl.Ct. 335, 346 (1989). Thus, even if plaintiff attempted to delegate authority in this case, plaintiff still remained responsible by retaining the "power to compel or prohibit the allocation of corporate funds." *Godfrey,* 748 F.2d at 1576.[9]

In sum, plaintiff had sufficient status, duties, and authority to show responsibility for violation of § 6672. Plaintiff was legally responsible for Heatherly's and Pan Alaska's failure to pay employment taxes.

### Willfulness Test

■ Responsibility is only one part of the test for liability under § 6672. A responsible person must also willfully fail to collect, account for, and pay over federal taxes. The Court of Claims defined a willful act under § 6672 as a "deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government." *White,* 372 F.2d at 521. The Claims Court's predecessor further explained:

> [I]t is not necessary that there be present an intent to defraud or to deprive the United States of taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness.

*Id.* To prove "willfulness," the Court of Claims did not require "a showing of evil motive, bad purpose, or calculated malevolence." *Scott,* 354 F.2d at 295. The Federal Circuit counselled trial courts, however, not to ignore the element of personal fault. *Godfrey,* 748 F.2d at 1577.

■ The primary focus of the willfulness test is the taxpayer's diligence in attending to the duty to pay employment taxes. By undertaking all reasonable efforts to fulfill that duty, taxpayers can show that they did not willfully neglect their obligations under § 6672. *Feist v. United States,* 221 Ct.Cl. 531, 542, 607 F.2d 954, 961 (1979).

■ Reckless disregard of a "known or obvious risk that trust funds may not be remitted to the Government," on the other hand, constitutes willfulness. *Godfrey,* 748 F.2d at 1578; *see also Burack v. United States,* 198 Ct.Cl. 855, 871, 461 F.2d 1282, 1292–93 (1972). The Federal Circuit clarified that this disregard could take the form of "failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted." *Godfrey,* 748 F.2d at 1578, quoting *Mazo,* 591 F.2d at 1155.

■ Thus, taxpayers may violate § 6672 willfully either by choosing to pay creditors other than the United States with knowledge of the tax delinquency, or by recklessly disregarding a known risk that taxes might not be paid. Under these standards, plaintiff willfully did not pay federal employment taxes for Heatherly and Pan Alaska.

### Heatherly's Fourth Quarter 1980

■ The record does not show that plaintiff intentionally preferred other creditors to the United States after learning of Heatherly's tax delinquency for the fourth quarter of 1980. Plaintiff, however, recklessly disregarded a known risk that Heatherly would not pay taxes. Therefore, plaintiff willfully violated § 6672.

Heatherly was no stranger to employment tax delinquencies. Specifically, Heatherly—under the day-to-day direction of Mr. Thronson—was no stranger to employment tax delinquencies. Plaintiff was well aware of Heatherly's delinquencies in

9. Mr. Thronson, to whom plaintiff apparently delegated responsibility for Heatherly and at key times early in 1982 for Pan Alaska, testified that plaintiff handled the big decisions. *See, e.g.,* Tr., at 366. Moreover, Mr. Thronson repeatedly testified that plaintiff handled financial matters. *See, e.g.,* Tr., at 346, 363, 369. Mr. Thronson testified that he sometimes disregarded plaintiff's instructions about the use of funds. Tr., at 358. Plaintiff's failure to supervise adequately Mr. Thronson, does not absolve him of responsibility for financial management:

> The fact that plaintiff was a busy man who held many offices in numerous enterprises only indicates that he may have been so overburdened he was unable to handle all of his responsibilities well; it does not establish that he did not have the responsibility for payment of the tax.
>
> *Feist v. United States,* 221 Ct.Cl. 531, 540, 607 F.2d 954, 960 (1979).

1976 and 1977. Plaintiff's All–Car lent Heatherly over $80,000.00 to retire these delinquencies. Moreover, Heatherly did not pay employment taxes for the third quarter of 1980. Yet plaintiff continuously retained and relied on the same manager who caused these problems, Mr. Thronson, as Heatherly's day-to-day manager. This disregard alone does not show recklessness, but does suggest that plaintiff had cause to be wary. Due to past patterns, plaintiff had reason to know that Heatherly might not pay taxes in the face of the company's financial difficulties at the close of 1980.

Plaintiff also had other reasons to be wary of Mr. Thronson's looseness with finances. Mr. Thronson diverted Heatherly accounts payable to Alaska All Car without plaintiff's permission. Tr., at Ex. 109, p. 212. Upon learning of this diversion, Tr., at 384–85, plaintiff ordered Mr. Thronson on February 2 to rescind this diversion and assign the Norcon account back to Heatherly. Tr., at Ex. 110, p. 213.[10] On the same day, Norcon paid Alaska All Car $50,000.00 due to Heatherly.

Plaintiff learned of Heatherly's delinquency in October or November 1980. Ms. Brady's records and Mr. B.J. O'Connor's testimony verify this knowledge. Indeed, upon reflection, plaintiff agreed that he must have known of Heatherly's tax problems as early as October 1980. During this period, plaintiff was not distant, but present in Alaska regularly, negotiating with Sea–Land for a new trucking contract.

From November 6, 1980 to April 16, 1981, after plaintiff knew of Heatherly's tax delinquency, Alaska All Car paid $39,270.00 to Heatherly. Stip., at ¶ 107. On February 2, 1981, after Heatherly suspended operations, Norcon paid Heatherly $50,000.00. This payment, however, went to Alaska All Car's account. Plaintiff was aware that Norcon owed payments to Heatherly. In fact, he earlier advised Mr. O'Connor to use Norcon receivables to pay taxes.

Thus, after plaintiff learned of Heatherly's delinquency, Alaska All Car paid Heatherly over $39,000.00. Further, Norcon paid $50,000.00 of Heatherly's money to Alaska All Car. After plaintiff learned of Heatherly's delinquency, Heatherly's corporate tax return, dated July 31, 1981, showed total assets in excess of $734,000.00. Tr., at 256–57, Ex. 27. A simple check of Heatherly's account would have disclosed funds available to pay taxes. In light of these facts, plaintiff recklessly disregarded his duty to use these funds to pay Heatherly's employment taxes.

Several factors confirm plaintiff's recklessness. First, plaintiff improperly relied on the same management which historically caused repeated tax difficulties. Second, after delinquencies in 1976, 1977, and earlier in 1980, plaintiff did not institute safeguards to ensure that tax delinquencies would not recur. Third, despite the ease of discovering the availability of Heatherly funds to retire the delinquency, plaintiff did not make the simple inquiries to ensure payment of taxes. These failures to inquire and to establish safeguards, coupled with knowledge of Heatherly's past problems, constituted reckless disregard of plaintiff's tax payment duties.

Plaintiff responds that he undertook all reasonable efforts to ensure tax compliance. Plaintiff's reasonable efforts amounted to verbal instructions to pay taxes, Tr., at 102, 159, 703, and employment of Mr. Langberg and Mr. O'Connor to check Mr. Thronson's looseness with finances.

---

10. Many events important to Heatherly's tax status happened almost concurrently at this time. On February 2, 1981, Mr. B.J. O'Connor met with Ms. Brady and learned of Heatherly's continuing difficulties. Tr., at Ex. 205. Plaintiff must have learned at the same time of Mr. Thronson's diversion of Norcon funds which were earmarked to pay taxes because plaintiff directed Mr. Thronson to rescind the diversion on the same day as the IRS meeting. On the same day that Mr. Thronson rescinded the diversion, Norcon paid $50,000.00 owed to Heatherly into Alaska All Car's account. Stip., at ¶ 65. On February 5, IRS served notices of levy on Norcon seeking payment of Heatherly's taxes. Stip., at ¶ 72. Norcon later paid $50,000.00 to IRS with respect to this levy. Id. A short time later, on February 18, plaintiff met with Ms. Brady.

Under the circumstances, however, these were not reasonable efforts.

In light of Heatherly's history of tax abuse, plaintiff had an obligation to establish effective financial controls to prevent nonpayment. *See Wright v. United States*, 809 F.2d 425, 428 (7th Cir.1987). Plaintiff instituted no such safeguards. Mr. Langberg and Mr. O'Connor had far more limited mandates than acting as financial safeguards within Heatherly. Further, the record shows that plaintiff paid less attention to Heatherly's finances during the times when the warning signals were most distinct. After learning of another delinquency for the fourth quarter of 1980, and of Mr. Thronson's diversion of the Norcon funds, plaintiff did not actively take the initiative to ensure payment. At that time, plaintiff could easily have checked the bank account of Heatherly and Alaska All Car to discover the availability of funds to pay taxes.

In this context, the Seventh Circuit provides fitting guidance:

> [I]f a responsible officer knows that the corporation has recently committed such a delinquency and knows that since then its affairs have continued to deteriorate, he runs the risk of being held liable if he fails to take any steps either to ascertain, before signing checks, what the state of the tax withholding account is, or to institute effective financial controls to guard against nonpayment.... It is not enough that he left it all to ... [another officer] without even inquiring from him what steps would be taken to prevent a repetition of the tax delinquency....

*Wright*, 809 F.2d at 428. This description fits plaintiff. Plaintiff instituted no safeguards against nonpayment. The record does not show that he even asked Heatherly's officers what steps would be taken to prevent another nonpayment. Further, plaintiff took no affirmative steps to ascertain the corporation's tax status in the face of clear signs of the diversion of Heatherly funds. A simple check of Heatherly's books would have disclosed the crisis and the source of funds to alleviate it.

Plaintiff acted with reckless disregard of the duties of a responsible person under § 6672. This disregard constitutes willfull violation of this IRC provision of the tax code for Heatherly in the fourth quarter of 1980.

██ Plaintiff also contends that IRS wrongfully misapplied Heatherly's payments on its fourth quarter 1980 liabilities to preexisting Heatherly and Sky Hill tax delinquencies. On August 19, 1980, Heatherly issued two checks to the IRS. In accordance with IRS procedure, Ms. Brady applied those funds to retire past Heatherly and Sky Hill deficiencies. The checks contained some ambiguous markings, but nothing to indicate that plaintiff clearly intended a different allocation of the funds. On September 24, 1980, Ms. Brady notified plaintiff of the allocation to preexisting delinquencies. Plaintiff did not notify IRS of any disagreement with this allocation.

In making the allocation to past delinquencies, Ms. Brady followed IRS procedure. Rev.Rul. 73–305, 1973–2 C.B. 43. This procedure requires a taxpayer to make any specific allocation requests in writing. Plaintiff did not make a written request for a specific allocation. Ms. Brady made efforts to call plaintiff to ascertain an appropriate allocation. Tr., at 964, Ex. 210. When plaintiff did not return her calls, Ms. Brady made a reasonable allocation. Plaintiff cannot now contest IRS's action.

*Pan Alaska's Fourth Quarter 1981*

██ Plaintiff did not willfully fail to pay employment taxes for Pan Alaska's fourth quarter of 1981. IRS did not assess Pan Alaska for underpayment of this quarter's liability until September 26, 1983. IRS did not notify plaintiff of Pan Alaska's liability for this quarter until 1985. Thus, at the time that plaintiff first learned of a delinquency, no amount of diligence would have produced Pan Alaska funds to retire the obligation. At that time, Pan Alaska had no assets to pay taxes.

A showing of reckless disregard requires the coincidence of three elements: (1) the responsible person's knowledge (or reason to know) of a risk that taxes will not be

paid, (2) a reasonable opportunity to discover and remedy the problem, and (3) a failure to undertake the reasonable efforts to ensure payment. For this quarter, plaintiff has shown the absence of elements (1) and (2).

Mr. Thronson, who had caused earlier tax problems, was not working for Pan Alaska in 1981. Pan Alaska had employed Mr. Rainwater and other competent financial advisors to monitor its affairs. Plaintiff had no reason to be wary of tax nonpayment risks in late 1981.

Defendant contends that the $171,132.78 previously transferred from Pan Alaska's accounts to Alaska All Car "should have been available" to pay these taxes in late 1983 or 1985. Defendant's Memorandum of Contentions of Fact and Law, filed April 4, 1990, at 36. Defendant's argument is speculative. This court could just as easily speculate that Pan Alaska's account would have been exhausted by other tax liabilities and debts to other creditors. Whatever the disbursements, plaintiff learned of the tax problem only when Pan Alaska likely had no assets. For these reasons, plaintiff did not willfully fail to pay employment taxes for Pan Alaska in the fourth quarter of 1981.

*Pan Alaska's first quarter 1982*

█ Plaintiff recklessly disregarded the duty to pay employment taxes for this period. This disregard constitutes willfull violation of § 6672.

Plaintiff learned of this delinquency in March 1982 when Pan Alaska suspended operations. Moreover, plaintiff had ample reasons to be wary of tax nonpayment risks. The First Bank had stated that it would extend no further cash to Pan Alaska. Pan Alaska's accounts were tight. Aware of this tightness, plaintiff made special inquiries about payment of the Northwest Acceptance Company loan, which he had guaranteed personally. Into this keg of exposed financial dynamite, plaintiff himself threw the lighted match. Plaintiff put Mr. Thronson—the source of so many financial improprieties—in charge. Plaintiff cannot deny that these circumstances made him aware of the grave risk that Pan Alaska would not pay taxes. In fact, plaintiff recklessly helped create the risks.

Regardless of these risks, plaintiff learned of the tax delinquency in time to have taken corrective action. When he arrived in Alaska shortly after Pan Alaska closed, Ms. Parker told plaintiff of the nonpayment. With that knowledge, plaintiff could easily have monitored Pan Alaska's books to find funds for payment. Thereafter more than $146,000.00 passed through Pan Alaska's account. These funds could have satisfied much of the corporation's tax liability.

Plaintiff diligently pursued his accounts with Sea–Land. He even complained of a $3.09 underpayment. Yet, inexplicably, plaintiff did not ever check Pan Alaska's bank account. While plaintiff quibbled over $3.09 due from Sea–Land, Mr. Thronson transferred then-dead Pan Alaska's estate to Alaska All Car, a subsidiary of plaintiff's All–Car. The $146,172.78 ran through Pan Alaska's account between March of 1982 and July of 1983. Stip., at ¶ 110. At any time during this period, a single look at Pan Alaska's bank statement would have revealed the source of funds to pay taxes.

Moreover, plaintiff could have easily monitored Mr. Thronson's activities in transferring the $146,000.00 to Alaska All Car. The record of this trial is replete with evidence of Mr. Thronson's abuses. In addition to nonpayment of taxes, Mr. Thronson had historically shifted funds amongst corporate entities according to his own whims. For instance, when working for Heatherly, Mr. Thronson had assigned the Norcon funds to Alaska All Car. Plaintiff had every reason to monitor closely Mr. Thronson after closure of Pan Alaska. Instead plaintiff gave Mr. Thronson authority to conduct the auction of Pan Alaska's assets and effectively turned his back.

In light of all circumstances, plaintiff recklessly and wantonly disregarded his duty as a responsible person to ensure payment of Pan Alaska's taxes for the first quarter of 1982. This reckless disregard constitutes a willfull violation of § 6672.

## CONCLUSION

For both Heatherly and Pan Alaska, plaintiff was responsible to ensure payment of federal employment taxes. In both corporations, plaintiff had sufficient status, duties, and authority to control allocation of corporate funds.

Plaintiff willfully failed to fulfill his duty as a responsible person for Heatherly's fourth quarter of 1980 and Pan Alaska's first quarter of 1982. In both quarters, plaintiff recklessly disregarded known risks that the corporations might not pay taxes.

Plaintiff did not willfully violate § 6672 for Pan Alaska's fourth quarter of 1981. Plaintiff knew of no risks that Pan Alaska would not meet its tax obligations. By the time plaintiff learned of the delinquency, no reasonable efforts would have satisfied the corporation's tax obligations. Pan Alaska had no funds.

As specified, this court directs the clerk to enter judgment for defendant on its counterclaim, with plaintiff's complaint to be dismissed. The parties shall file by July 23, 1990, a stipulation setting forth the precise dollar amount of this judgment. The clerk shall execute that amount without further order of this court.

No costs.